1  LATHAM & WATKINS LLP
       Kailen Malloy (Bar No. 341851)
2    *kailen.malloy@lw.com*
     140 Scott Drive
3    Menlo Park, CA 94025
     Tel: (650) 328-4600
4
     LATHAM & WATKINS LLP
5        Jason R. Burt (*Pro Hac Vice forthcoming*)
         Connor J. Madden (*Pro Hac Vice forthcoming*)
6        Parag Dharmavarapu (*Pro Hac Vice forthcoming*)
     *jason.burt@lw.com*
7    *connor.madden@lw.com*
     *parag.dharmavarapu@lw.com*
8    555 Eleventh Street, NW, Suite 1000
     Washington, D.C. 20004-1304
9    Tel: (202) 637-2200

10   Attorneys for Plaintiff
     Together AI, Inc.
11                        UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF CALIFORNIA
12

13

14   TOGETHER AI, INC., d/b/a TOGETHER          CASE NO.  3:25-cv-04687
     COMPUTER, INC., a Delaware corporation,
15
                         Plaintiff,
16                                              **COMPLAINT FOR DECLARATORY
            v.                                  RELIEF, BREACH OF CONTRACT, AND
17                                              BREACH OF THE COVENANT OF GOOD
     SESTERCE FRANCE LABS SAS, a French         FAITH AND FAIR DEALING**
18   corporation, and SESTERCE GROUP SAS,
     a French corporation,
19
                         Defendants.            **DEMAND FOR JURY TRIAL**
20

21

22

23

24

25

26

27

28

Plaintiff Together AI, Inc., d/b/a Together Computer, Inc. ("Together"), for its Complaint against Defendants Sesterce France Labs SAS ("Sesterce France Labs"), Sesterce Group SAS ("Sesterce Group") (collectively with Sesterce France Labs, "Sesterce" or "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      Sesterce, a French technology business, entered into a business contract with Together, a pioneering artificial intelligence company, and committed wrongdoings at every stage of the parties' dealings: Sesterce made key misrepresentations in negotiating the contract, later attempted to finagle its way out of the contract, and eventually breached the contract.  Together seeks to hold Sesterce accountable for its wrongful actions and recover the tens of millions in losses Together has suffered as a result of Sesterce's deception and failure to keep its end of the deal.

2.      In August 2024, Together entered into negotiations with Sesterce through its agent, broker Hydra Host, Inc. ("Hydra"), regarding access to Together's state-of-the-art cloud platform called Together Forge ("Forge").  The platform helps businesses create and run custom generative AI models.  Sesterce specifically sought to access a number of "clusters" of Graphics Processing Units ("GPUs"), which supply computing power that enables a user to train and run custom AI tools—with the Forge platform enabling access to and use of the contracted-for clusters.

3.      On September 12, 2024, the parties executed a contract (the "Contract") under which Together agreed to provide Sesterce access to the Forge platform, including a specific number of clusters, in exchange for monthly payments over a ten-month term, collectively totaling approximately $20.6 million.[1]  The Contract identified Sesterce as the "customer" and was signed by Sesterce's CEO, Youssef El Manssouri; identified Hydra as the "broker" and was signed Hydra's CEO, Aaron Ginn; and identified Together as the "vendor" and was signed by Together's CEO, Vipul Ved Prakash.

---

[1] The Contract is attached hereto as **Exhibit A**.

4.    Although Sesterce contracted with Together to obtain access to Forge, Sesterce *itself* did not actually intend to use Forge.  Instead, Sesterce needed Together's platform and services to support Sesterce's own, independent customer (referred to as the "designated end user" in the Contract)—Mistral AI, a French startup company that sought cloud computing power and an AI training platform like Forge.  While the Contract was in no way conditioned on the existence of an "end user"—Sesterce was unconditionally liable for payment, no matter who actually used the services Together agreed to provide—Together had sought assurances during the Contract negotiations that Sesterce had in fact contracted with Mistral to be the end user of Forge for the duration of the Contract term.  The representations Together received regarding the existence of such an agreement between Sesterce and Mistral for use of the Forge platform appeared to reduce the amount of risk to Together, as Sesterce seemed to have the funds needed to fulfill its contractual obligations.  Sesterce, through its agent Hydra, had assured Together that Sesterce already had a contract with Mistral that would run for at least the next ten months as of September 19, 2024, when the parties executed the Contract.

5.    Performance under the Contract began without issue: Sesterce paid its first required installment, and Mistral—as the end user—began using Forge within the parameters of the Contract.

6.    Upon information and belief, and unbeknownst to Together, whatever agreement (if any) Sesterce had with Mistral had expired by the time Sesterce and Together executed the Contract.  On November 4, 2024, nearly two months into the Contract, Sesterce came clean and admitted to Together that, contrary to *all* representations made throughout the entire course of the negotiations, Sesterce was in fact attempting to secure a *new* contract with Mistral.  Although the existence of a "designated end user" had no effect on the Contract or Sesterce's obligation to pay for the full term of Together's services, for the next month Sesterce continued to offer Together assurances about its relationship with Mistral, and by extension, Sesterce's ability to perform under the Contract.  Indeed, Sesterce went out of its way to repeatedly tell Together that an agreement between Sesterce and Mistral was imminent.  Despite these repeated assurances, on December 3, 2024, Sesterce informed Together that Mistral had terminated negotiations with Sesterce.

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7.      Rather than honor its contractual obligations, on December 31, 2024, Sesterce purported to "rescind[]" the Contract on the pretense that Together had misled Sesterce during the Contract negotiations.  Specifically, Sesterce falsely asserted that Together had represented it owned the computing equipment—the GPU clusters—that would be used under the Contract, when in fact, Together had never hidden the fact that the number of clusters Sesterce requested during the Contract negotiations would require Together to lease additional clusters from a third-party.  Beyond the patent falsity of Sesterce's claim, ownership of the clusters was of no import: the Contract is silent as to ownership of the clusters.  Indeed, it is industry standard for computing infrastructure to be leased, and contracts seldom, if ever, specify or require ownership of such infrastructure.  No wonder, then, that Sesterce never once inquired about ownership of the clusters until December 31, 2024, after nearly a month of trying to find a means to escape its obligations under the Contract.

8.      Together's fears about Sesterce's performance absent an end user—the very reason Together had sought assurances that Sesterce had a formal agreement in place with Mistral to begin with—were realized.  Sesterce's actions have caused and continue to cause Together substantial damage.  Together thus brings this action to hold Sesterce accountable for its contractual commitments, and to recover compensatory and punitive damages for Sesterce's bad-faith and unfair dealings with Together, in addition to interest, fees, and costs.

**THE PARTIES**

9.      Plaintiff Together AI, Inc. is a technology company that enables researchers, developers, and businesses to develop, train, and deploy generative AI models.  Together is incorporated in Delaware, and its principal place of business is located at 251 Rhode Island Street #205, San Francisco, California 94103.

10.      Together offers a suite of products, made available through its cloud platform Forge, that enable users to develop open-source and custom AI models at low cost and with industry-leading flexibility and efficiency.  For example, Together offers "serverless inference," a cloud computing model that allows customers to deploy machine learning models without managing the underlying computing infrastructure.  Together supports a diverse array of customers, including nonprofits, small startups, established brands, and multi-billion-dollar companies.

11.      Upon information and belief, Defendant Sesterce France Labs (SIRET no. 84275343600026) is a corporation organized and existing under the laws of France with its principal place of business at 50 Avenue des Caillols 13012, Marseille, France.  Sesterce France Labs is the parent of Sesterce US, Inc. ("Sesterce US")—Sesterce's U.S.-based and wholly owned shell entity.  Sesterce France Labs is the sole operational Sesterce entity, with all other affiliated entities serving as shell or holding companies.  Youssef El Manssouri is the CEO of Sesterce France Labs.

12.      Upon information and belief, Defendant Sesterce Group SAS (SIRET no. 90237248100025) is a corporation organized and existing under the laws of France with its principal place of business at 50 Avenue des Caillols 13012, Marseille, France.  Sesterce Group is the holding company of Sesterce France Labs, with no employees or business operations of its own.

**JURISDICTION AND VENUE**

13.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  There is complete diversity between the Plaintiff (a citizen of California and Delaware) and Defendants (citizens of France), and the amount in controversy exceeds $75,000.

5

14.    This Court has personal jurisdiction over Defendants because each of Defendants purposefully availed itself of the privilege of conducting business in California.    Indeed, Defendants entered a business relationship with Together—a California-based company whose employees primarily work and reside in California—to receive access to Together's computing tools and services, and this dispute arises directly from that business relationship.

15.    This Court is the proper venue for this Complaint pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.    Together accepted and executed the Contract in San Francisco, where it is headquartered; the Contract's obligations and liabilities arise in California; Defendants, through broker Hydra, wired a down payment of $1.7 million to Together's bank account in California; and Defendants' breach caused Together to suffer harm in California.

## DIVISIONAL ASSIGNMENT

16.    Pursuant to Civil Local Rule 3-2(c), this action is properly assigned to the San Francisco Division of this Court because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in San Francisco.

## FACTUAL ALLEGATIONS

**A.    Together's Innovative Platform for Building and Training Artificial Intelligence Models**

17.    Customers purchase subscriptions to access Together's cloud platforms, including Forge, a secure software infrastructure for training large custom AI models.    These AI models include large language models ("LLMs"), which are designed to process, understand, and generate human language based on vast amounts of text data.    Through Forge, Together provides each customer a specific number of "GPUs" or "nodes"—with a group of nodes referred to as a "cluster"—that are optimized for training LLMs or other AI models.

18.    A Forge customer has exclusive access to its own dedicated cluster (or clusters) for training large AI models.    When Together leases a Forge cluster to a customer, that same cluster cannot be used by another customer.

19.    It is not uncommon that during use, certain nodes within a cluster will fail.  When those nodes fail, Together will refund clients for those GPUs failing in the form of "downtime credits"—an industry-standard practice in which a service vendor, like Together, issues an apportioned refund for the total amount of time that hardware failure prevented the customer's user of a node.  In the Contract with Sesterce, Together agreed that if node performance fell below 90% at any point during the first sixty days of the Contract term, Sesterce had the right to terminate the Contract.  Together's node performance never fell below 90% during the entirety of the period it was working with Sesterce.

**B.    The Contract Provided Access to Together's Platform in Exchange for Monthly Payments**

20.    In late August 2024, Hydra, acting as an agent on behalf of Sesterce, approached Together with an opportunity to enter a contract with Sesterce.  Hydra told Together, who had never dealt with Sesterce, that Sesterce already had engaged another entity for access to an AI training cluster—a product similar to Forge—but Sesterce was dissatisfied with the competitor's product and thus wanted to switch to Forge.

21.    Hydra informed Together that Sesterce would not be the end user of Forge.  Instead, Hydra represented that Sesterce wished to contract with Together on behalf of a then-unnamed end user and client of Sesterce—a third-party AI company—with whom Sesterce purportedly had a service contract, under which the third-party company paid Sesterce for services including access to a cluster for AI training.  Hydra relayed to Together that, according to Sesterce, the unnamed AI company had grown dissatisfied with the cluster that Sesterce had previously secured.  Based on information from Sesterce, Hydra specifically represented that Sesterce had ten months remaining on its service contract with the unnamed AI company, and was looking to expeditiously secure a contract with Together to satisfy its contractual obligations and keep its client happy.

22.    On August 22, 2024, a senior Together representative ("Together Representative") sent detailed specifications for Together's Forge product directly to Hydra's CEO, Aaron Ginn, and Hydra's Head of Sales Engineering, Ryan Horjus, explaining that the cluster Together would

offer could be customized to fit Sesterce's needs and could be "accessible the first week of September—basically as soon as the contract is signed."

23.     Over the next several days, Together and Hydra—on behalf of Sesterce—discussed financial terms of the transaction.  On August 27, 2024, Horjus responded to Together Representative, stating that "the price is in the right spot" and Sesterce was "working on internal approvals."

24.     Between August 28 and September 4, 2024, the parties ironed out various technical specifications of the cluster, including RAM capacity, storage, and testing details.

25.     After those specifications were finalized, Horjus contacted Together Representative on September 6, 2024, writing, "Is it possible to get access to this cluster today? We need to deliver everything to the end customer all pre implemented."

26.     Negotiations continued between September 6 and September 11, 2024, during which Sesterce was anxious to get an agreement executed.  Horjus called Together Representative frequently to ask when Sesterce would get access to Together's platform, leading Together to believe that Sesterce wanted access as soon as possible.

27.     Indeed, even on September 10, 2024, as the parties were revising a potential agreement, Horjus requested regular and frequent updates as to whether Sesterce could access Together's platform to complete immediate testing of the product.

28.     Together hesitated to allow Sesterce to proceed with immediate testing as requested.  Sesterce had not revealed its client—the intended end user of Together's Forge product—nor had it shared the contract between Sesterce and the undisclosed client.  Additionally, Sesterce had not provided financial information demonstrating its ability to pay for Together's services.

29.     To address Together's concerns, Horjus revealed the identity of Sesterce's undisclosed client to Together Representative: Mistral AI, a fast-growing and reputable French AI company.  Horjus represented that Sesterce had a service contract with Mistral, and explained that Sesterce was urgently seeking access to a new AI training cluster for Mistral, as its current cluster was inadequate, but there were still ten months left on the contract between Sesterce and Mistral.

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

In sharing the identity of the end user, Horjus did not disclose details about the Sesterce-Mistral relationship.

30.    Based on these discussions, Together understood that Sesterce had ten months remaining on a contract with Mistral, and that Mistral was the end user who would ultimately be using Forge.   Having never previously engaged with Sesterce, and without financial documentation proving Sesterce's independent ability to pay for Together's services, this assurance—that Mistral, a known and reputable company, would be contractually bound (for at least ten months) to pay Sesterce for Mistral's use of Forge—alleviated Together's concerns about Sesterce's ability to perform under the Contract, which in turn put Together at ease about moving forward with product testing.

31.    The truth, however, as Together later learned, was that at the time of the Contract negotiations in September 2024, whatever service contract Sesterce had with Mistral—if any— would expire that autumn.  In fact, unbeknownst to Together, Sesterce was attempting to secure Mistral's business for an additional undisclosed term by having obtained from Together a high-performing cluster for Mistral's use.

32.    Another key topic addressed during the negotiations was the Contract's duration. Sesterce initially wanted to enter a ten-month contract with Together, which further confirmed to Together that Sesterce had ten months remaining on its purported service contract with Mistral. Together Representative, however, urged that the Contract between Together and Sesterce be for twelve months.  Together Representative explained that Together could not enter a contract term of less than twelve months for a cluster of this size.  Sesterce expressed no concern about the ownership of the node cluster during negotiations of the Contract.  Together then entered into a lease of the necessary GPUs with a third-party vendor (detailed *infra* ¶ 37).

33.    The parties ultimately agreed to a 304-day term (approximately ten months), with the Contract automatically renewing for one year upon its expiration unless Sesterce provided at least sixty days' notice before the end of the initial term to opt out of auto-renewal.  Together agreed to a ten-month term, believing, based on Sesterce and Hydra's repeated and unwavering representations, that Sesterce had ten months remaining on its service contract with Mistral.

9

34. On September 10, 2024, Together gave Sesterce access to the cluster to test and set up a channel on Together's communications platform, Slack, to support testing.

35. By September 12, 2024, Together and Hydra—on behalf of Sesterce—had settled on the substantive terms of the Contract, agreeing to language that obligated Sesterce to pay Together all monies due on the Contract.

36. On or about September 19, 2024, Together's CEO signed the Contract on behalf of Together, and Sesterce and Hydra signed thereafter. The Contract identifies Sesterce as the "customer," Hydra as the "broker," and Together as the "vendor."

37. The Contract requires Together to provide Sesterce and its end user with "access to at least 80 nodes" with at least "90% availability" over the Contract's first two months. In providing access to its Forge training platform under the Contract, Together had significant cost outlays, including the cost of GPUs, a physical asset through which the digital software operates. To satisfy its obligations under the Contract, Together leased GPU access for twenty-four months from a third-party vendor, at a total cost of $36,419,174.40, of which $16,209,587.20 came from the ten months covered by the Contract.

38. In exchange for access to Together Forge, the Contract requires Sesterce to make twelve payments to Together totaling $20,569,882 over the course of roughly eleven months: an initial payment upon execution of the contract for $1,711,821; another payment in the same amount at the end of the first month; a payment of $3,085,482 at the end of the second month; and payments of $1,562,306 at the end of the third through eleventh months.

39. The Contract expressly provides that "[a]ny cancellation" of the Contract would "result in an acceleration of payment equal to 100% of the total contract fees payable" to Together and that the fees payable "shall become due immediately on cancellation" (the "Acceleration Clause").

40. The Contract nowhere conditions Sesterce's obligations or performance under the Contract on Together's ownership of physical property, leases, assets, or servers (collectively, "infrastructure"). And it is industry standard to lease the necessary infrastructure.

10

41.     The Contract does not condition Sesterce's performance on the existence of, or Sesterce's ability to find, an end user.  To the contrary, the Contract expressly requires payments on a monthly schedule, and imposes a late fee for any payments not timely remitted.  Sesterce was and is thus obligated to make all payments required under the Contract, regardless of whether it had or has an end user.

**C.     The Contract Identifies Sesterce France as Party to the Contract**

42.     The draft agreement that Together Representative circulated on September 12, 2024—and every draft agreement circulated thereafter, including the Contract signed by Together—reflected that Sesterce France, located at 50 Avenue des Caillols 13012, Marseille, France, would be the relevant party to the Contract.  Indeed, in *all* its interactions with Sesterce, both direct and indirect, Together communicated and interacted exclusively with Sesterce France and its employees and agents.

43.     At all times, Together thus believed it was agreeing to provide services to Sesterce France.  Upon information and belief, the funds that were used to pay the first installment payment for Together's services originated from Sesterce France.  For example, when Sesterce finally sent Together its bank statement on September 16, 2024, the statement reflected the cash flows and balance sheet for only Sesterce France.  Furthermore, every draft agreement prior to execution of the Contract listed Sesterce France as the relevant Sesterce party.

44.     Indeed, when Together signed the Contract, the Contract listed Sesterce France as party to the agreement.  However, sometime after Together signed the Contract, and without Together's knowledge or consent, either Sesterce France or Hydra superimposed "Sesterce US Inc" (including a never-mentioned Delaware mailing address) over the name and address of Sesterce France, as shown below:

11

> Name: Sesterse (Sesterce) US Inc
>
> Address: 300 Avenue Villebran 300 Creekview Blvd, Suite 209, Newark, DE Marseille, France 19711
>
> Billing contact: youssef@sesterce.com

Ex. A at 1.

45.    Notably, Sesterce France had spelled its entity's name incorrectly as "Sesterse" in the Contract, but used the correct spelling, "Sesterce," when superimposing the U.S.-based subsidiary after the Contract was signed.[2]

46.    Despite this new text imposed over Sesterce France, Youssef El Manssouri, Sesterce CEO, was still listed as the billing contact and signed the Contract on behalf of Sesterce, not "Sesterce US Inc," because he signed the Contract on behalf of the incorrectly spelled French entity, *Sesterse*," not the correctly spelled U.S. subsidiary, "Sesterce US Inc."

> **For Customer: Sesterse**
> **Name: Youssef El Manssouri**
> **Title: CEO**
>
> Signature:    *Youssef El Manssouri*
> 6D41B59B1A8E4EA...

47.    Upon information and belief, Sesterce US is wholly owned by Sesterce France and has no operations or employees of its own.  Thus, upon information and belief, Sesterce France superimposed the name of its U.S.-based subsidiary onto the agreement in a bad faith effort to limit its own liability if it breached the Contract.

**D.    Together Performs Under the Contract.**

_____

[2] Together has no reason to believe that "Sesterse" is a distinct entity from "Sesterce."  For purposes of this Complaint, Together adopts "Sesterce" as the correct spelling of the Defendant entities.

12

48.     Together began performance even before the Contract was signed.  As discussed above, on September 11, 2024, Sesterce, Hydra, and Together created a "channel" on Slack, Together's communications platform, to discuss next steps and troubleshoot any technological issues.  From that date forward and at all times, Together provided access to far more than the 80 nodes required under the Contract.  In fact, Together ensured that Sesterce had access to no fewer than 120 dedicated nodes.  Provision of these nodes came at significant effort and cost to Together.  Maintaining 120 dedicated and fully interconnected nodes put this cluster in the same class as some of the top supercomputers in the world.

49.     Yet Sesterce and Mistral expected even more.  Upon information and belief, the initial, undisclosed Mistral-Sesterce contract required node performance near 99% at all times—a figure substantially higher than the performance level required under the Contract (90% for the first sixty days), and well above industry norms.

50.     If Sesterce had insisted on continuous 99% node performance as the required performance level under the Contract, Together would not have entered the agreement, as Together could not feasibly ensure that level of node performance.  But Sesterce did no such thing—in fact, Sesterce did not raise *any* objection to the 90% threshold for node performance provided in the Contract.  Moreover, Sesterce failed to disclose the 99% performance level term of its service agreement with Mistral to Together until late October 2024, many weeks after the Contract's execution.

51.     Sesterce timely made the initial payment of $1,711,821 on September 27, 2024, through Hydra.

52.     Together maintained consistent communication with both Sesterce and Hydra about issues related to technical performance of its Forge product.  Whenever Sesterce raised issues related to node performance, Together promptly resolved them.

53.     On October 16, 2024, Sesterce sought assistance in attempting to resolve Mistral's issues related to Together's Lightweight Directory Access Protocol ("LDAP"), a protocol that concerns sign-on and authentication.  After Together promptly resolved this issue, a Sesterce employee thanked Together for its work to improve the efficiency and consistency of LDAP.

13

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

54.     On November 7, 2024, Sesterce contacted Together to request that Mistral's storage be increased by fifty terabytes as soon as possible.  Within minutes, Together had fulfilled Sesterce's request.  A Sesterce employee replied, "awesome guys ! thanks for reactivity."

55.     As explained *supra* ¶ 48, at all relevant times Together ensured Sesterce had access to no fewer than 120 nodes—far more than the 80 required under the Contract.  Even though Together was already performing far in excess of its contractual obligations, Together nevertheless acted promptly to resolve each issue that Sesterce raised—including the instances described above—as quickly as possible.

56.     Mistral used the cluster through the end of December 2024.  Defendants, however, never compensated Together for Sesterce's use of the cluster between September 27, 2024, when the first payment upon signing was made, and December 31, 2024.

**E.     Sesterce Purports to "Rescind" the Contract**

57.     On or about November 4, 2024, during a weekly meeting with Together, Sesterce, for the first time stated it was then in contract *negotiations* with Mistral.

58.     This disclosure stunned Together.  From before the Contract's execution until November 2024, Sesterce—including through its agents—had led Together to believe that Sesterce had *previously* entered an agreement with Mistral that had ten months remaining when the Contract was signed.

59.     When Sesterce informed Together in early November 2024 that it was instead *negotiating* a contract with Mistral, Sesterce confidently assured Together that renewal was imminent and even remarked that Mistral had been pleased with node performance in the recent weeks.  Sesterce maintained that narrative for nearly a month, representing to Together on a near-daily basis that execution of a service agreement with Mistral was imminent.

60.     Not so.  On December 3, 2024, Sesterce informed Together that its negotiations with Mistral had ceased, and Sesterce had failed to renew its contract with Mistral.

61.     Unbeknownst to Together, on December 3, 2024, Sesterce CEO Manssouri informed Hydra that "Mistral want[ed] to step down from the actual contract with Together" because of the "overall experience" and the "drained nodes of last week," referencing an incident

14

on November 26, 2024, when multiple nodes were drained and offline.  Those nodes were repaired just two days later, on November 28.  Regardless, at no time did node performance fall below 90%, and in any event, Sesterce's sixty-day option to terminate in the event of performance below 90% had already expired.

62.    Upon information and belief, Mistral did not actually "step down" early from any contract with Sesterce.  Instead, Mistral chose not to enter a *new* service agreement with Sesterce, apparently because Sesterce could not live up to a 99% node performance guarantee Mistral demanded—a service guarantee that Together never agreed to provide, and which conflicts with the express terms of the Contract.

63.    In their December 3, 2024 communications, Horjus replied to Manssouri, asking what Sesterce and Hydra should "do about the contract with [T]ogether," given the difficulties with Mistral.

64.    Manssouri replied that Sesterce was "[s]till in co[]mmunication with Mistral" regarding the Contract, and Sesterce would seek "to get the payment until now *and close [the Contract] as proper as possible*" (emphasis added).

65.    Ginn, Hydra's CEO, asked if Sesterce could win Mistral back, but Manssouri explained that Mistral was at "full capacity" and not interested.  Manssouri then stated that he could " try to see if [he] [could] put another customer" in Mistral's place.

66.    Later that same day, Manssouri messaged Together Representative directly on WhatsApp, explaining that Mistral "want[ed] to step down from their current contract."  He added that he was "currently working on as many leads as possible to try and replace them on this cluster."  Over subsequent WhatsApp messages, Manssouri represented he would "find someone" to replace Mistral as an end user.

67.    Manssouri then contacted Horjus and Ginn again.  In that conversation, Manssouri once more recognized Sesterce's obligation to continue under the Contract.  He added that he was "working on as many leads as possible to try and replace [Mistral] on this cluster."

68.    But Sesterce did not secure another end user customer.  Instead, Sesterce hired attorneys and cooked up a scheme to try to get out of its obligations under the Contract.  On

15

December 31, 2024, counsel for Sesterce notified Together by email that Sesterce "hereby rescinds" and "terminates" the Contract. The email baselessly claimed that Together made "false statements of material fact to Sesterce, namely, for example, that Together fully owned the infrastructure for the services under the [Contract]." Sesterce further claimed that it would not have entered into the Contract if it "knew that Together did not own such infrastructure." Sesterce has never provided any other grounds for purporting to terminate the Contract.

69. Sesterce's about-face shocked Together. At no point during negotiations did Together claim ownership of its infrastructure, nor did Sesterce ever question whether that infrastructure was leased. Contrary to this newfound (and false) claim, Together had been fully transparent during negotiations that it would lease the nodes at issue. The Contract nowhere requires that Together own the nodes used to provide the required service.

70. On January 13, 2025, Together's counsel sent a letter to both Sesterce and Hydra, responding to Sesterce's December 31 email. In that letter, Together explained that Sesterce had identified no permissible basis for Sesterce to rescind the Contract. Invoking the Acceleration Clause in the Contract, Together demanded that Sesterce immediately pay the outstanding $18,848,061 under the Contract, plus a 2.5% monthly late fee for any delay in payment.

71. Seven days later, Sesterce sent a letter to Together that doubled down on its purported basis to rescind the Contract. In that letter, Sesterce stated that it could void the Contract, because Together had allegedly "fraudulently induc[ed]" Sesterce to enter into the Contract "based on Together's misrepresentations concerning its ownership of the infrastructure."

72. Again, that assertion was categorically false: Together had never misrepresented its ownership of its physical property, leases, assets, servers, or infrastructure. Of note, none of the correspondence from Sesterce explained why Sesterce allegedly would not have entered into the Contract had it known that Together leased the infrastructure.

73. Sesterce did not make any subsequent payments, in violation of the express terms of the Contract. Indeed, Sesterce expressly ignored its obligations to pay Together.

74. Together contacted Horjus on December 10, 2024, writing, "Do you have an update on when we should be receiving payment on these unpaid invoices?" Horjus responded on

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

December 10, 2024 that he was "working with" Sesterce on payment and "[s]hould report back soon." But neither Sesterce nor Hydra ever followed up with a solution on paying the outstanding invoices.

75.     Since Sesterce's abrupt breach, Together was unable to lease the nodes designated for and unused by Mistral to any other customer for approximately three months. That idle time cost the company millions of dollars.

76.     Sesterce continued to have access to the nodes, however, despite its acknowledged failure to pay. On or about March 5, 2025, after it became clear that Sesterce would not find another client or make further payment under the Contract, Together turned off Sesterce's access to the cluster. The loss of access prompted Sesterce (remarkably) to demand that same day that Together turn access back on. Together responded by reminding Sesterce that access had been turned off due to its months-long failure to pay.

## **FIRST CLAIM FOR RELIEF**

### **(Breach of Contract)**

77.     Together incorporates by reference the allegations in Paragraphs 1-76 above as though fully set forth herein.

78.     Together, Sesterce, and Hydra executed the Contract on or about September 19, 2024, whereby Together agreed to provide access to its Forge product over a ten-month period in exchange for payment of $20,569,882 from Sesterce. Therefore, at all relevant times since September 19, 2024, and as more fully described herein, there exists, and has existed, a valid and written contract between Defendants and Together.

79.     The Contract requires Sesterce to make twelve payments to Together over the course of roughly eleven months: an initial payment upon execution of the Contract for $1,711,821; another payment in the same amount at the end of the first month; a payment in the amount of $3,085,482 at the end of month two; and payments of $1,562,306 at the end of months three through eleven. Sesterce, through Hydra, timely paid the initial payment of $1,711,821 on September 27, 2024.

80.     Since that initial payment, Sesterce has not made any additional payments as required under the Contract.  Sesterce instead blatantly repudiated and violated its obligations under the Contract by, among other acts, attempting to unilaterally terminate the Contract and refusing to pay for Together's services under the Contract.  In doing so, Sesterce fabricated a patently false basis for its unilateral breach.  Sesterce has thus breached the Contract and deprived Together of millions of dollars of revenues.

81.     Together has performed all of its obligations under the Contract, or would have performed the same but for the repudiation by Sesterce, or otherwise such obligations have been waived or excused.  Specifically, Together ensured that Sesterce had access to the requisite number of nodes, or computer pathways or connections, in its Forge product.

82.     As a direct and proximate result of Sesterce's unilateral breach, Together has been damaged by Defendants' acts and omissions complained of herein in an amount to be determined at trial, but no less than $18,858,061, which represents the total outstanding balance due under the Contract, plus 2.5% monthly interest provided by the Contract for late payments, and pre- and post-judgment interest on the total amount owed.  Together has also been damaged by the amounts it spent to lease and maintain the GPUs required under the Contract, in an amount to be determined at trial.  Together is also entitled to incidental and consequential damages stemming from Sesterce's breach, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

83.     Together incorporates by reference the allegations in Paragraphs 1-82 above as though fully set forth herein.

84.     A covenant of good faith and fair dealing is implicit in the Contract as a matter of California law, imposing a contractual duty on the parties.

85.     Sesterce failed to make any additional required payments under the Contract after the initial payment on September 27, 2024.  Sesterce instead blatantly repudiated and violated its obligations under the Contract by, among other acts, attempting to unilaterally terminate the Contract and refusing to pay for Together's services under the Contract.  Sesterce deprived

18

Together of the benefits conferred by the Contract in violation of the parties' expectations at the time of contracting.  Months after signing, Sesterce concocted a fabricated, pretextual interpretation of the Contract to shirk its obligations.  Even if Sesterce subjectively believed its false and pretextual explanation, its unilateral and flagrant breach of the Contract was objectively unreasonable.  Sesterce never once inquired into or expressed any interest in the ownership of Together's infrastructure during negotiations, and it is standard in the industry for such infrastructure to be leased.

86.    Sesterce also failed to disclose that it had not reached an agreement with Mistral that included the time period covered by the Contract, and that its existing agreement with Mistral, which, upon information and belief, expired sometime in the autumn of 2024, required performance well above the level required under the Contract.  And when it became apparent in November 2024 that Sesterce had no existing contract with Mistral, Sesterce repeatedly misled Together to believe that a contract renewal with Mistral was imminent and there was nothing to worry about.  When Mistral fell through as the end user, Sesterce then falsely represented that it would work to obtain a new end user.  All of this was false.

87.    In further bad faith, Sesterce attempted to deceived Together by attempting to add its non-operational U.S.-based subsidiary, "Sesterce US Inc," as a party to the Contract, to limit its own liability and prevent Together from recovering damages from the party with whom it contracted—Sesterce France.

88.    Each of these actions involved bad faith, subterfuge, an abuse of its obligations, and an evasion of the spirit and letter of the parties' bargain.

89.    As a direct and proximate result of these breaches, Together has been damaged by the breach of the covenant and is entitled to punitive damages and reasonable attorneys' fees and costs, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Together respectfully prays that this Court enter judgment against Defendants, and each of them, as set forth below:

1.    Declaring that Together did not breach the Contract;

2.    Declaring that Sesterce did breach the Contract;

3.    Awarding Together's direct, incidental, and consequential damages, including at least the $18,858,061 owed under the Contract, plus the contractually-specified late fee of 2.5% added for each month in which Sesterce failed to provide payment, plus the $16,209,587 in costs associated with the GPU leases induced by the Contract, as well as pre- and post-judgment interest, all in a total amount to be determined by the fact-finder;

4.    Awarding punitive damages in an amount to be determined by the fact-finder;

5.    Awarding Together reasonable attorneys' fees and costs and

6.    Awarding such other and further relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of all claims in the above-captioned action that are triable to a jury.

Dated: June 3, 2025                Respectfully submitted,

*/s/Kailen Malloy*
_____

Kailen Malloy (Bar No. 341851)
**LATHAM & WATKINS LLP**
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
kailen.malloy@lw.com

Jason R. Burt (*Pro Hac Vice forthcoming*)
Connor J. Madden (*Pro Hac Vice forthcoming*)
Parag Dharmavarapu (*Pro Hac Vice forthcoming*)
**LATHAM & WATKINS LLP**
555 11th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
jason.burt@lw.com
connor.madden@lw.com
parag.dharmavarapu@lw.com

*Attorneys for Plaintiff Together AI, Inc.*

20