UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOGETHER AI, INC.,<br>Plaintiff,<br>v.<br>SESTERCE FRANCE LABS SAS, et al.,<br>Defendants. | Case No. 25-cv-04687-JST<br>**ORDER DENYING MOTIONS TO DISMISS AND STRIKE; ORDER DENYING MOTION TO STAY**<br>Re: ECF Nos. 38, 70 |

Before the Court is Defendants Sesterce France Labs SAS and Sesterce Group SAS's (collectively "Sesterce France") motion to dismiss the amended complaint and strike Plaintiff Together AI's prayers for punitive damages and attorney's fees. ECF No. 38. The Court will deny the motion.

## I. BACKGROUND

For purposes of deciding this motion, the Court accepts as true the following allegations from Plaintiff Together AI, Inc.'s amended complaint, ECF No. 33. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Together AI is an artificial intelligence company that offers customers groups of Graphics Processing Units, called GPU clusters, which supply computing power to train and run customer AI tools. ECF No. 33 (Am. Compl.) ¶¶ 1–2, 20. The GPUs are housed across multiple large servers called "nodes," which work together to process datasets. *Id.* ¶ 20. In addition to supplying access to GPU clusters, Together AI provides support to service and maintain those clusters. *Id.* ¶¶ 1–2, 21. Defendant Sesterce France SAS is a France-based technology broker, whose CEO is Youssef El Manssouri. *Id.* ¶¶ 3, 14. Defendant Sesterce Group SAS is the holding company of Defendant Sesterce France SAS. *Id.* ¶ 15. Non-party Sesterce US, Inc. is a Delaware corporation

United States District Court
Northern District of California

United States District Court
Northern District of California

and Sesterce France's US-based wholly-owned subsidiary. *Id.* ¶¶ 14, 48. El Mannssouri formed Sesterce US in January 2022, but the company has no independent operations, no employees, no physical presence or office, and no meaningful assets. *Id.* In March 2025, the Delaware Division of Corporations listed Sesterce US's corporate status as "Void, AR's or Tax Delinquent"[1] and no annual report had been filed since 2022. *Id.* Together AI alleges that Sesterce US does not have active corporate powers or privileges due to this status. *Id.* ¶ 49.

In June 2024, broker Hydra Host, Inc. ("Hydra") and Sesterce France entered a twelve-month agreement, under which Hydra agreed to facilitate the rental of an AI training cluster, scheduled to begin in July 2024. *Id.* ¶¶ 2, 22. In August 2024, Sesterce France, through Hydra, reached out to Together AI about contracting for access to a GPU cluster. *Id.* ¶¶ 3, 23. Together AI communicated with members of Hydra's team in addition to El Manssouri. *Id.* ¶ 23. Sesterce France represented to Together AI that it had an on-going service contract with an unnamed third party, who was dissatisfied with its current GPU cluster and was quickly seeking a new cluster. *Id.* ¶ 24. Together AI identified a cluster that met Sesterce France's requirements and provided access to Sesterce France for performance testing while the parties negotiated a contract. *Id.* ¶¶ 25–26.

Together AI demanded information from Sesterce France to ensure that it had the ability to pay the contract including the name of the third-party end user and financial information demonstrating Sesterce France's ability to meet the terms of the contract. *Id.* ¶ 27. Sesterce France did not immediately provide such financial information, but on a call between September 10 and 19, 2024, El Manssouri represented to Together AI's CEO Vipul Ved Prakash that Sesterce France had an existing service contract with Mistral AI, a well-known and growing French AI company, with at least ten months remaining. *Id.* ¶ 27. Sesterce France and Hydra further represented during negotiations that their agreement ran parallel to the Mistral contract. *Id.* ¶ 28. Based on these representation, Together AI granted Sesterce France early access to test the

---

[1] "AR delinquent" "represents a corporation that has not filed the required annual report." Glossary of Terms, Delaware Division of Corps., https://icis.corp.delaware.gov/Ecorp/FieldDesc.aspx [https://perma.cc/77SQ-ATE5] (last visited Sept. 19, 2026).

United States District Court
Northern District of California

platform before there was a formal agreement in place. *Id.* ¶ 29.

Between September 12 and 19, the parties negotiated the final terms of the contract, including contract duration. *Id.* ¶ 32. Together AI demanded a twelve-month contract rather than Sesterce France's preference of ten months. *Id.* "Before executing the Contract, Together informed Sesterce that it still needed financial documentation from Sesterce before it could finalize and sign the Contract." *Id.* ¶ 33. "Sesterce eventually provided a screenshot of its bank account ledger, showing the cash available to the French entity Sesterce Group SAS. The cash balance assured Together that Sesterce could, at that time, pay at least several monthly installment payments, while the trend of Sesterce's monthly cash inflow over the six months preceding September 16, 2024 . . . indicated Sesterce would likely maintain its ability to meet its payment obligations well into the future." *Id.*

Relying on these representations, Together AI signed a contract on September 20, 2024, under which Together AI agreed to provide Sesterce access to a designated GPU cluster of roughly 1,000 GPUs in exchange for monthly payments over a twelve-month term, collectively totaling approximately $20.6 million. *Id.* ¶ 2–3. The contract was not conditioned on the existence of an end user, and Sesterce was unconditionally liable for payment, but "Together had sought assurances prior to executing the Contract that Sesterce had, in fact, contracted with an end user, thereby assuring that Sesterce would be able to satisfy its payment obligations." *Id.* ¶ 5. "Sesterce assured Together that Sesterce already had a contract with Mistral that would run for at least ten months following September 20, 2024, when the parties executed the Contract." *Id.* The drafts circulated prior to the contract's execution listed Sesterce France SAS as the Customer with an address in Marseille, France. *Id.* ¶ 41.

Together AI and El Manssouri executed the contract twice. First, on September 19, 2024, Sesterce France, through Hydra, superimposed "Sesterce US Inc.," a previously unknown entity with a Delaware mailing address, over Sesterce France's information in the "Customer" section of the contract. *Id.* ¶ 42. Together AI alleges that Sesterce France performed this change without its knowledge or agreement. *Id.* ¶¶ 41–43. El Manssouri executed the contract on behalf of the Customer and Prakash executed the contract on behalf of Together AI. ECF No. 33-2 at 7.

United States District Court
Northern District of California

ECF No. 33-2 at 2.

After executing the first contract, Together AI noticed the contract erroneously specified a 304-day (or 10-month) term, instead of the agreed-upon 365-day term. Am. Compl. ¶ 45. The parties re-executed the Contract to correct only that provision on September 20, 2024. *Id.* In this amendment, "Hydra, at Sesterce's direction, and without notice to Together, modified the Contract to replace 'Sesterce' and its French business address with "Sesterce US Inc" and its purported Delaware address, which is merely the address of its registered agent." *Id.* ¶ 46. El Manssouri executed the contract on behalf of Sesterce US and Prakash executed the contract on behalf of Together AI. *Id.* at 7. The signature page on both contracts listed the Customer as "Sesterse"[sic] and El Manssouri as the CEO of Sesterce France SAS. *Id.* at 7; ECF No. 33-2 at 7.

Together AI performed subject to the terms of the contract. Am. Compl. ¶¶ 57–62. Sesterce France was granted access to the GPU cluster, and the parties maintained communication about any technical issues, like Sesterce France's request for an additional fifty terabytes of storage in November 2024. *Id.* ¶ 62. During this time, Together AI's interactions were with individuals who held themselves out as employees of Sesterce France. *Id.* ¶ 63. Together AI received the first payment under the contract on September 27, 2024 from Sesterce France SAS's French bank account. *Id.* ¶¶ 53, 64.

In November 2024, Sesterce France admitted to Together AI that the contract with Mistral AI had expired and they were attempting to secure a new contract, contradicting their representations in September that they had ten months remaining at that time. *Id.* ¶¶ 7, 65–66. Together AI pleads it would not have entered the contract with the Sesterce entities had it known Sesterce's contract with Mistral was set to expire. *Id.* On December 3, a Sesterce entity informed Together AI that Mistral AI had terminated contract negotiations, *id.* ¶ 67, and on December 31, Sesterce US sought to rescind the contract with Together AI, claiming that Together AI represented during their negotiations that it owned the computing equipment that was the subject of the parties' contract, rather than securing the cluster from a third party. *Id.* ¶ 69.

In response to Sesterce US's purported contract recission, Together AI invoked the contract's acceleration clause, demanding payment of $18,858,061 due immediately with an

addition 2.5% monthly late fee. *Id.* ¶ 71. Sesterce France continued to have access to the GPU clusters until March 5, 2026, when Together AI terminated its access because it became clear that Sesterce France could not secure another client or make future payments under the contract. *Id.* ¶ 74. Sesterce France demanded that Together AI turn access back on. *Id.* During the idle period, Together AI was unable to lease the nodes to another customer, costing the company millions of dollars. *Id.* ¶ 75. "In providing access to a designated cluster and Together's cloud training platform under the Contract, Together had significant cost outlays, including the cost of the GPU cluster that Together had leased for twenty-four months from a third-party vendor to satisfy Sesterce's purported needs, at a total cost of $36,419,174.40, of which $16,209,587.20 came from the ten months covered by the Contract." *Id.* ¶ 76.

Together AI filed this action against Sesterce France in June 2025. ECF No. 1. Sesterce France moved to dismiss the initial complaint, ECF No. 25, and Together AI responded by filing an amended complaint. ECF No. 33. It brings claims for declaratory relief, breach of contract, breach of the covenant of good faith and fair dealing, and fraudulent inducement. *Id.* Sesterce France now moves to dismiss the amended complaint and, in the alternative, to strike the prayers for punitive damages and attorney's fees. ECF No. 38. Together AI opposes the motion, ECF No. 42, and Sesterce France has filed a reply. ECF No. 43.

## II. JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). There is complete diversity between the parties. Together AI is a citizen of California and Delaware and the Sesterce France defendants are citizens of France. Am. Compl. ¶ 16. The amount in controversy exceeds $75,000. *See id.* ¶ 71; *id.* at 24 (seeking contractual damages or costs, both exceeding $16 million).

## III. LEGAL STANDARD

### A. Rule 12(b)(2)

When a defendant objects to the Court's exercise of personal jurisdiction over it under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). "Where, as

here, a motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Love v. Associated Newspapers, Ltd.,* 611 F.3d 601, 608 (9th Cir. 2010). To make this showing, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). The complaint's uncontroverted allegations must be taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004).

Federal courts recognize two types of personal jurisdiction over a defendant: general and specific. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty*, 582 U.S. 255, 262 (2017) (citation omitted). "A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different [s]tate." *Id.* (emphasis and citation omitted). General jurisdiction arises "when [the defendant's] affiliations with the [s]tate are so 'continuous and systematic' as to render them essentially at home in the forum [s]tate." *Id.* (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 317 (1945)). Although general jurisdiction might be found elsewhere in an "exceptional case," a corporation is usually "at home" only in its place of incorporation and its principal place of business. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021).

By contrast, specific jurisdiction arises when a defendant's contacts with the forum give rise to the claim in question. *See Daimler AG v. Bauman*, 571 U.S. 117, 188 (2014). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum [s]tate and is therefore subject to the State's regulation.'" *Id*. (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154–55 (9th Cir. 2006) (citing *Fireman's Fund Ins. Co. v. Nat. Bank of Coops*., 103 F.3d 888, 893 (9th Cir. 1996)). "Where, as here, no federal

statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).

Because California's long-arm jurisdictional statute authorizes jurisdiction to the fullest extent permitted by the Constitution, *see* Cal. Code Civ. P. § 410.10, the central question is whether the defendant has "at least 'minimum contacts' with [California] such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe,* 326 U.S. at 316). The Ninth Circuit has established a three-part inquiry, referred to as the minimum contacts test, to determine whether a court has specific personal jurisdiction over a defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id.* at 802. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* If the plaintiff does so, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

**B. Rule 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While this standard is not "akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel*, 393 F.3d at 1072.

### C. Rule 12(f)

Pursuant to Rule 12(f), a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

"Motions to strike are generally regarded with disfavor." *Los Angeles Waterkeeper v. SSA Terminals, LLC*, 702 F. Supp. 3d 903, 931 (C.D. Cal. 2023) (citation and quotation omitted). They are "generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Rosales v. Citibank, Federal Sav. Bank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001). Any doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike. *See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

## IV. DISCUSSION

### A. Personal Jurisdiction

Sesterce France contends that the Court lacks personal jurisdiction over Sesterce France Labs SAS and Sesterce Group SAS because they are incorporated and headquartered in France and did not enter into the agreement with Together AI. ECF No. 38 at 18–19. "And because Defendants did not enter into an agreement with Plaintiff, there is no specific jurisdiction over

them." *Id.* at 19.

As set forth below, the Court finds that Together AI has adequately alleged that Sesterce France did enter into a contract with Together AI (on an alter ego basis) and that Sesterce France fraudulently induced Together AI to enter into that agreement. Because that is the only ground on which Sesterce France disputes jurisdiction, the Court rejects its argument. In any event, the case law is in accord. In *Taylor-Rush v. Multitech Corp.*, for example, the California Court of Appeal held that jurisdiction is proper over a nonresident defendant who makes misrepresentations or nondisclosures to the plaintiff which then induce the plaintiff to enter into a contract. 217 Cal. App. 3d 103, 113 (1990). The court also applied its holding to a second defendant whose fraudulent misrepresentations and nondisclosures were made outside California yet were purposely directed at the California plaintiff and had a tortious effect there. *Id.* at 114. So here, the allegations that Sesterce France made misrepresentations to Together AI leading it to enter into a contract with Sesterce France are sufficient to support a finding of specific jurisdiction.[2]

Sesterce France's motion to dismiss for lack of personal jurisdiction is denied.

**B. Breach of Contract**

Sesterce France moves to dismiss Together AI's breach of contract claim. A cause of action for breach of contract requires the following elements: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Bluestar Genomics v. Song*, 709 F. Supp. 3d 847, 854 (N.D. Cal. 2023) (citation omitted). When a contract is reduced to writing, "the intention of the parties is to be ascertained from the writing alone, if possible. . . ." Cal Civ. Code § 1639.

**1. Existence of Contract with Sesterce France**

Together AI alleges that the contract is with Sesterce France, ECF No. 42 at 15, whereas Sesterce France claims that Sesterce US is the sole contracting party. ECF No. 38 at 14–16. The parties do not dispute that the operative contract is the September 20 contract, which refers to only

[2] Sesterce France does not address the three elements of the minimum contacts test, but the Court finds that Together AI has established the first two elements, and Sesterce France has not shown that the exercise of jurisdiction would be unreasonable.

Sesterce US as the "Customer" and that the payment obligations under the contract are owed by the "Customer." ECF No. 33-1 at 2, 5. Together AI seeks to avoid the plain language of the contract by alleging that "Sesterce [France] is the contracting party" which it argues must be accepted as true as pled in the amended complaint. ECF No. 42 at 15. Together AI alleges that the signature page identified the Customer as "Sesterse"[sic] and its signatory as CEO of Sesterce France SAS, Yousself El Manssouri. It contends "[t]his alone plausibly pleads Sesterce [France] is the Customer in the Contract." *Id.* at 16. Sesterce France argues that the Court is not required to accept the allegation that Sesterce France is the contracting party when the exhibit attached to the complaint contradict the pleading, and there is no ambiguity in the contract. ECF No. 43 at 7–9.

The Court agrees with Sesterce France. In interpreting a contract, courts start with the text, and consider extrinsic evidence only when there is an ambiguous term. *Ewert v eBay, Inc.*, No. C–07–02198 RMW, 2010 WL 4269259, at *6 (N.D. Cal. Oct. 25, 2010) (citing *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 39–40 n.8 (1968)). The operative agreement identifies Sesterce US as the only counterparty, even if Sesterce France's CEO signed the agreement in a representative capacity. ECF No. 33-1 at 2, 7. Nothing in the agreement, other than El Manssouri's title, referred to Sesterce France. ECF No. 33-1 at 7. Sesterce France was not party to the September 20 contract, Together AI cannot assert a direct breach of contract claim against it. *See, e.g., Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1054–55 (N.D. Cal. 2010).

**2. Alter Ego Theory**

Together AI also argues that Sesterce France is liable for breach of contract under an alter ego theory. "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests." *Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 300 (1985). The purpose of the doctrine is to bypass the formalities of corporate separateness "in narrowly defined circumstances." *Id.* at 301. California recognizes alter ego liability "[f]irst, where 'there is such unity of interest and ownership that the individuality, or separateness, of said person and corporation has ceased' and,

second, where 'adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice." *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (quoting *Wood v. Elling Corp.,* 20 Cal.3d 353, 365 n.9 (1977)). Alter ego is a theory of liability, not an independent cause of action, such that plaintiffs must allege an underlying cause of action. *See, e.g., Ahcom, Ltd. v. Smeding,* 623 F.3d 1248, 1251 (9th Cir. 2010) (quoting *Hennessey's Tavern, Inc. v. American Air Filter Co.*, 204 Cal.App.3d 1351, 1358–1359 (1988)) ("A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, *e.g.*, breach of contract or to set aside a fraudulent conveyance, but rather, procedural. . . .").

Together AI argues that Sesterce US is Sesterce France's alter ego, such that Together AI has a valid breach of contract claim against Defendants. ECF No. 42 at 21–23. Sesterce France responds that "alter ego is derivative," such that Together AI's failure to name Sesterce US as a defendant means there is no valid underlying claim." ECF No. 43 at 11. Defendants cite no authority for the proposition that Together AI is required to sue Sesterce US as the counter-party to the contract in order to assert an alter ego claim against Defendants, and it is not an accurate statement of the law. "In California, multiple procedural vehicles are available to a party asserting alter ego liability." *LUX EAP, LLC v. Bruner*, No. 5:17-CV-01359-SP, 2025 WL 1544096, at *1 (C.D. Cal. Jan. 28, 2025) (citing *MSY Trading Inc. v. Saleen Auto., Inc.*, 51 Cal. App. 5th 395, 402–03 (2020). "Among them are . . . instituting an independent action against the alter egos." *Id.* (citation omitted); *see also Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 127 (1979) (plaintiffs sued defendants as the alter egos of the makers of a promissory note but did not sue the makers because they were insolvent). While Together AI may later choose to add Sesterce US as a defendant, it is not required to do so.

Sesterce France next argues that Together AI has not adequately pleaded alter ego liability. ECF No. 43 at 12. Plaintiff responds that it alleges that Sesterce US is a wholly owned and controlled subsidiary of Sesterce France, with no independent operations, employees, physical presence, or meaningful assets; that Sesterce France's officers and employees engaged in all relevant negotiations and interactions leading up to the signing of a contract; and that Sesterce France remitted the first, and only, payment on the contract ever made through a bank account in

its name. ECF No. 42 at 21–23.

"In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Brown Bark III, L.P. v. Haver*, 219 Cal. App. 4th 809, 823 n.6 (2013). "Whether a party is liable under an alter-ego theory is normally a question of fact." *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811 (2010).

"Under California law, the alter ego determination requires looking at the totality of the circumstances." *Kite Shipping LLC v. San Juan Nav. Corp.*, No. 11cv02694 BTM (WVG), 2012 WL 6720624, at *3 (S.D. Cal. Dec. 26, 2012). "Those circumstances include, but are not limited to: (1) whether the parent and subsidiary commingle funds and other assets, (2) whether the parent has represented to third parties that it is liable for the subsidiary's debts, (3) whether the parent owns 100 percent of the subsidiary's stock, (4) whether the parent and subsidiary use the same offices and same employees, (5) whether the subsidiary is used as the "mere shell or conduit" for the affairs of the parent, (6) whether the subsidiary is inadequately capitalized, (7) whether the parent or subsidiary disregards corporate formalities such as holding board meetings, keeping corporate records, and acting through votes of the corporate board, (8) whether the parent and subsidiary commingle their corporate records, (9) whether the parent and subsidiary have "identical directors and officers," (10) whether the parent has diverted the subsidiary's assets to the parent's uses." *Santa Clarita Org. for Plan. & Env't v. Castaic Lake Water Agency*, 1 Cal. App. 5th 1084, 1105–06 (2016) (quoting *Hasso v. Hapke*, 227 Cal. App. 4th 107, 155 (2014)).

The allegations here map directly onto several of these factors. A wholly owned subsidiary with no independent operations, employees, physical presence, or meaningful assets is precisely the type of entity courts describe as a mere shell or conduit for the affairs of the parent. The allegation that Sesterce France's own officers and employees conducted all relevant negotiations and interactions implicates the shared-employees and shared-management factors. The allegation that Sesterce France remitted the only payment ever made under the contract

through a bank account in its own name supports an inference of commingling of funds and assets, and further suggests that the subsidiary lacked the independent financial capacity to perform its own contractual obligations — bearing on inadequate capitalization. Taken together, these allegations touch on multiple recognized factors and, assessed under the totality-of-the-circumstances standard, are sufficient to state an alter ego claim at the pleading stage.

With regard to the second prong, and assuming for purposes of the motion the truth of Together AI's allegations, respecting the corporate form here would condone Sesterce France's "shell game" and allow it to escape the liabilities of a contract from which it reaped the benefits— the type of inequitable result that is sufficient to support alter ego liability. *See, e.g.*, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 638–39 (N.D. Cal. 2020).

Accordingly, Sesterce France's motion to dismiss the breach of contract claim is denied.

**C. Breach of Implied Covenant of Good Faith and Fair Dealing**

Sesterce France next moves to dismiss Together AI's claim for breach of the implied covenant of good faith and fair dealing. "Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990) (citations and internal quotation marks omitted). "Or, to put it another way, the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Id.* (citation and internal quotation marks omitted). A "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself and it has been held that bad faith implies unfair dealing rather than mistaken judgment." *Id.* at 1394 (citation and internal quotation marks omitted). Thus, to state a claim for breach of the implied covenant of good faith and fair dealing, the plaintiff must allege facts that

> show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet this criteria must be determined on a case by case basis and will depend on the

> contractual purposes and reasonably justified expectations of the parties.
>
> If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

*Id.* at 1395; *see also Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1370 (1999) (holding that, where the "claim of breach of the implied covenant relies on the same acts, and seeks the same damages, as [the plaintiff's] claim for breach of contract," the court may dismiss the claim for breach of the implied covenant of good faith and fair dealing as duplicative).

Sesterce France argues that Plaintiff's allegations in support of its implied covenant claim mirror its breach of contract allegations and do not identify any separate or independent harm. ECF No. 43 at 12–13. Together AI responds that "the gravamen of [its] breach of the implied covenant of good faith and fair dealing claim is that Sesterce 'frustrat[ed]' Together's 'right to receive the benefits of the' Contract . . . through a series of bad faith actions, including misleading Together about its contract with Mistral AI, misleading Together about a contract renewal with Mistral AI, falsely representing that it would work to obtain a new end user, and attempting to deceive Together by swapping in Sesterce US as a purported party to the Contract to limit its own liability." ECF No. 42 at 24.

The Court agrees with Together AI. *Clements Family Trust v. Vimmia, LLC* is instructive. No. 8:25-CV-00122-WLH-DFM, 2025 WL 2427782 (C.D. Cal. May 27, 2025). In that case, plaintiffs alleged that defendants "misrepresent[ed] their financial position" and "ma[de] false statements about their inventory" "as a pretextual reason to terminate the relationship and ultimately engage in a "scheme to profit from Plaintiffs' efforts[.]" *Id.* at *16. The court found that "[t]aking these allegations as true, this conduct—while not technically transgressing the express covenants in the Agreement—would frustrate Plaintiffs' rights to the benefit of the contract." *Id.* (citation modified). In *Scosche Industries, Inc. v. S & T Montgomery Distributing, Inc.*, No. 2:22-CV-09030-SVW-MAA, 2023 WL 5506021 (C.D. Cal. July 6, 2023), plaintiff alleged that defendants "submit[ted] falsified records to [plaintiff] to induce and receive payments from [plaintiff]" and also "misled [plaintiff] about various employees when confronted with the

United States District Court
Northern District of California

fact that the employees had said they had left [defendant's] employment long before their time was billed to [plaintiff]. *Id.* at *3. The court denied a motion to dismiss, finding that plaintiff had adequately pled a claim for breach of the covenant. In both cases, as here, defendants made misrepresentations that went beyond simple breaches of contract terms in order to frustrate plaintiffs' ability to receive the benefits of a contract. The Court will deny Sesterce France's motion to dismiss this claim.

**D. Fraudulent Inducement**

Fraud and fraudulent inducement have the same elements under California law, *Romero v. San Pedro Forklift, Inc.*, 266 Fed. App'x 552, 556 n.2 (9th Cir. 2008), which are: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004).

Federal Rule of Civil Procedure 9(b) requires a party "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake," but allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to "be alleged generally." Fed. R. Civ. P. 9(b). This rule ensures that a defendant has adequate notice of the specific conduct alleged to be fraudulent. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

Sesterce France argues that Together AI's fraudulent inducement claim fails because the amended complaint does not meet the heightened pleading standard under Rule 9(b), the claim is barred by the economic loss doctrine, and Together AI did not justifiably rely on Sesterce France's misrepresentations. ECF No. 38 at 21–25.

**1. Rule 9(b)**

Together AI alleges that Sesterce France's misrepresented that they had a binding contract with Mistral AI of at least ten months duration. Am. Compl. ¶ 5, 7. It alleges that El Mansourri told Together AI about this contract during phone conversations between September 10 and 19, 2024, prior to the execution of the contract, "to assure Together of Sesterce's ability to satisfy the discussed payment terms." *Id.* ¶ 27. Sesterce France claims this allegation is not specific enough because Together AI fails to allege "the actual words allegedly spoken, the precise terms

United States District Court
Northern District of California

purportedly represented, the exact date of any statements and in what context and particular substance of any specific false statement." ECF No. 38 at 22 (emphasis omitted).

Sesterce France's argument is unconvincing. It points to no case where allegations similar to Together AI's were dismissed on particularity grounds. Nor does it explain how why the notice provided by the complaint is inadequate. Rather, it refers to the allegations as "broad" without further explaining how it did not receive adequate notice of the misrepresentations or why the precision it demands is required by law. Together AI identifies who made the statement, approximately when the statement was made, the context in which it was made, and why it was made. Am. Compl. ¶¶ 5, 7, 27. This is sufficient under Rule 9(b). *See United Healthcare*, 848 F.3d at 1180 (Rule 9(b) does not demand "absolute particularity," "a precise time frame," or "the precise method used to carry out the fraud"). The motion to dismiss on this ground is denied.

**2. Economic Loss Rule**

Damages in breach of contract cases are generally limited to "purely economic loss" due to a party's breach. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). "The economic loss rule requires a purchaser[3] to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Id.* This rule "prevent[s] the law of contract and the law of tort from dissolving one into the other." *Id.* The rule is subject to exceptions, however, the paradigmatic one of which is fraud. "[A] tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." *Id.* at 990 (citing *Erlich v. Menezes*, 21 Cal. 4th at 553–54). *See also id.* at 991 (economic loss rule does not bar plaintiff's fraud claims because they were independent of the breach of contract claims); *Ladanowsky v. FCA US LLC*, 2024 WL 5250357, at *4–5 (N.D. Cal. Dec. 30, 2024) (denying

[3] Although *Robinson Helicopter* uses the word "purchaser," the rule applies to sellers as well. *See, e.g., Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 17 (2024).

motion to dismiss fraudulent inducement based on economic loss rule). Thus, Together AI's fraudulent inducement claim survives application of the economic loss rule.

That Together AI also brings a breach of contract claim does not undermine its ability to bring a claim for fraud. "Tort damages have been permitted in contract cases where the contract was fraudulently induced." *Edwards v. FCA US LLC*, No. 22-CV-01871-WHO, 2022 WL 1814144, at *7 (N.D. Cal. June 2, 2022) (citation modified); *Harris v. Atl. Richfield Co.*, 14 Cal. App. 4th 70, 78 (1993) ("[W]hen one party commits a fraud during the contract formation or performance, the injured party may recover in contract and tort."); *Jacobs v. Sustainability Partners LLC*, No. 20-cv-01981-PJH, 2020 WL 5593200, at *15 (N.D. Cal. Sept. 18, 2020) (economic loss rule does not bar a fraud claim when a contract was fraudulently induced); *Mewawalla v. Middleman*, No. 21-cv-09700-EMC, 2022 WL 1304474, at *11–12 (N.D. Cal. May 2, 2022) (same).

The Court denies Sesterce France's motion to dismiss based on the economic loss rule.

**3. Justifiable Reliance**

Justifiable reliance requires that the misrepresented information was material such that "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" or "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." Restatement (Second) of Torts § 538; *see Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 333 (2011) (quoting the same). Sesterce France argues that Together AI has not plead reasonable reliance on its assurances regarding the Mistral AI contract. ECF No. 38 at 25–27. The contract was not conditioned upon an end user, does not mention Mistral AI, and holds Sesterce US unconditionally liable for payment. *Id.* at 27. Together AI also required Sesterce France to share its financial information in support of its ability to pay for the contract. *Id.* Given that information, Sesterce France argues that Together AI "cannot plausibly claim that it relied on the existence of a separate Mistral contract as a material condition of entering the agreement." ECF No. 43 at 15.

"Except in the rare case where the undisputed facts leave no room for a reasonable

United States District Court
Northern District of California

difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239, 900 P.2d 601 (1995). Together AI pleads that it repeatedly sought assurances from Sesterce France regarding its financial status, the identity of the intended end-user, and the term of Sesterce France's contract with that end user. Am. Compl. ¶¶ 27, 29, 32–33. Together AI sufficiently pleads that the Mistral contract's duration was material. For example, it alleges that "Sesterce's representation that it had at least ten months left on an existing service agreement with Mistral— in conjunction with Sesterce's financial documentation—was enough to reassure Together that Sesterce had the ability to perform." *Id.* ¶ 33. Together AI further alleges it would not have entered the contract with Sesterce France if it had known the true duration of the Mistral contract. *Id.* ¶ 93 ("Together would not have agreed to the Contract had Sesterce disclosed that its alleged contract with Mistral did not cover at least ten months of the Contract"). Together AI suggests that Sesterce France understood that the Mistral contract was material in their agreement. It alleges that El Manssouri "correctly understood that Together would not sign an agreement with an unknown company like Sesterce France unless Together believed that a reputable AI company like Mistral was the end user behind the Contract." *Id.* ¶ 91.

These allegations are sufficient to plead justifiable reliance. Sesterce France's motion to dismiss the fraudulent inducement claim is denied.

**E. Motion to Strike Punitive Damages**

Sesterce France seeks to strike Together AI's prayer for punitive damages, arguing that the case is, "at its core, a contract dispute." ECF No. 38 at 10. The argument ignores that Together AI also pleads a claim for fraudulent inducement, which provides a basis to seek punitive damages. *See, e.g., All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240–41 (1995) (explaining out-of-pocket damages, benefit-of-the-bargain damages, punitive damages, and interest are all permitted for fraud claim); *Channel v. Anthony*, 58 Cal.App.3d 290, 320 (1976).

Sesterce France's motion to dismiss on this ground is denied.

**F. Motion to Strike Prayer for Attorney's Fees**

Sesterce France also moves to strike Together AI's prayer for attorney's fees. Under the

United States District Court
Northern District of California

"bedrock principle" known as the "American Rule," "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010) (citation and quotation omitted). Federal courts "will not deviate from the American rule absent explicit statutory authority." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (citation and quotation omitted).

Together AI has now abandoned its claim for attorney's fees. ECF No. 42 at 32. Accordingly, Sesterce France's motion on this ground is denied as moot.

**CONCLUSION**

For the foregoing reasons, Sesterce France's motion to dismiss is denied; its motion to strike Together AI's prayer for punitive damages is denied; and its motion to strike Together AI's prayer for attorney's fees is denied as moot.

The motion to stay discovery pending the resolution of this motion, ECF No. 70, is denied as moot.

**IT IS SO ORDERED.**

Dated: September 21, 2026

JON S. TIGAR
United States District Judge